Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                    Plaintiffs,

               -against-

ERROL C. MALLETT, M.D., ERROL C. MALLETT
MEDICAL, P.C., 334 GRAND CONCOURSE MEDICAL,
P.C. and JOHN DOE DEFENDANTS "1" through "10",

                                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (     )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Errol C. Mallett, M.D., Errol C. Mallett

Medical, P.C., 334 Grand Concourse Medical, P.C., and John Doe Defendants "1" through "10"

(collectively, referred to hereinafter as the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $1,000,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including extracorporeal shockwave therapy ("ESWT"), electromyography ("EMG") testing, electromyography testing ("EMG") and nerve conduction velocity ("NCV") studies (collectively, the "Fraudulent Services").  The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.     In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $600,000.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)     the Fraudulent Services were allegedly provided by and billed through the Mallett Practices (as defined below), which are both medical "practices" not under the control and direction of Errol C. Mallett, M.D., but rather, was at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)   the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)    the Fraudulent Services, to the extent provided at all, were not provided by Errol C. Mallett, M.D. or another licensed physician employed by the Mallett Practices, but by persons who were unlicensed and not directly supervised by Errol C. Mallett, M.D. and/or by persons who were not employed by Mallett or any of the Mallett Practices.

3.    Defendant Errol C. Mallett, M.D. ("Mallett") is a New York physician who purports to own and operate two medical "practices", Errol C. Mallett Medical, P.C. using Tax Identification Number 82-245XXXX (hereinafter "Mallett Medical"), and 334 Grand Concourse Medical, P.C. using Tax Identification Number 82-252XXXX (hereinafter "334 Grand Concourse Medical", and together with Mallett Medical, the "Mallett Practices"). Mallett purported to have used the Mallett Practices (collectively, the "Mallett Defendants") to provide the Fraudulent Services to more than 500 GEICO Insureds over a period of six (6) months.

4.    In fact, the Mallett Defendants and the John Doe Defendants "1" through "10" (the "John Doe Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone approximately $1.75 million for the alleged performance of the Fraudulent Services at approximately thirty (30) separate locations from June of 2021 through December of 2021. Notably, more than 850 separate claim submissions were made to GEICO seeking payment of no-fault insurance benefits for the Fraudulent Services, all of which represented that Mallett was the legitimate owner of the Mallett Practices and that he allegedly performed almost virtually all of the Fraudulent Services. In truth, Mallett performed none of the Fraudulent Services and did not legitimately operate, manage or control the Mallett Practices.

5.    In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New

York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

6.     In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment this is very costly and is not typically portable.

7.     Defendants seized on these changes in the Fee Schedule (or lack thereof). The Mallett Defendants in association with the John Doe Defendants concocted a fraudulent treatment and billing scheme which primarily centered around the ESWT, and pursuant to which:

    (i)    unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(ii)    the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services; and

(iii)    the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

8.    The success of the fraudulent scheme required coordination between the Mallett Defendants and the John Doe Defendants.  In furtherance of the fraudulent scheme, they took the following actions:

(i)    Mallett allowed the John Doe Defendants to use his name, medical license and the Mallett Practices to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

(ii)    Mallett Defendants associated with "processors" who are among the John Doe Defendants. Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers; and

(iii)    The Mallett Defendants, through the John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

9.    Once the pieces were in place, the John Doe Defendants (i) used Mallett's medical license, tax identification numbers of the Mallett Practices, and electronic copies of his signature to generate mass quantities false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records, and (ii) used the Mallett Practices as a fictional healthcare "practices" to serve as billing vehicles through which millions dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

10.     Because the Mallett Practices was nothing more than a shell to hide the John Doe Defendants participation in the scheme, it was equally critical to the success of the fraudulent scheme for the Mallett Defendants and John Doe Defendants to partner with New York collection attorneys who were willing to:

(i)     purport to represent the physician and the billing entities;

(ii)    provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

(iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)    accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including the John Doe Defendants.

11.     At the time, the John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, the John Doe Defendants had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (*i.e.* the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

12.     At the time, the John Doe Defendants used the information received from Mallett to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records; (ii) the engagement letter and associated documents needed by the lawyers to bill and collect on the Fraudulent Services; and (iii) the funding agreements to present to the companies who were willing to advance

money against the receivables ("the Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances" against the claims for the Fraudulent Services. John Doe Defendants were not signatures to the funding agreements, received the money without risk and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

13.      Additionally, the John Doe Defendants regularly provided the package of documents associated with billing, collection, and funding efforts to the collection lawyers and thereafter, began to transfer the fabricated claim documents to the collection lawyers. Once the documents were processed by the collection lawyers into bills (i.e. "NF-3" forms) using the name of the Mallett Practices, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.  The collection lawyers:

> (i)      purported to represent Mallett and the Mallett Practices in hundreds of writings sent to GEICO;
>
> (ii)     arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of the Mallett Practices;
>
> (iii)    systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Mallett Practices; and
>
> (iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

14.      As discussed herein, the Defendants at all relevant times have known that: (i) Mallett was not in control of the Mallett Practices, and that they were operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the

Defendants and the Clinics; (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv) the Fraudulent Services, to the extent provided at all, were never provided by Mallett, but by persons who were never supervised by Mallett or employed by the Mallett Practices.

15. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO through the Mallett Practices.

16. Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

17. Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,000,000.00.

**THE PARTIES**

**I.** **Plaintiffs**

18. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.** **Defendants**

19. Defendant Mallett resides in and is a citizen of New York. Mallett is a physician licensed to practice medicine and agreed to allow for the use of the Mallett Practices and to "front"

as their owners while allowing the John Doe Defendants to use his license and the Mallett Practices as the billing "vehicles" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

20.     Mallett Medical is a New York professional corporation that was incorporated by Mallett on August 9, 2017 and lists its principal place of business as 7819 18th Avenue, Brooklyn, New York.

21.     334 Grand Concourse Medical is a New York professional corporation that was incorporated by Mallett on August 10, 2017 and lists its principal place of business as 334 Grand Concourse, Bronx, New York.

22.     John Doe Defendants are citizens of New York. John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Mallett Defendants by: (i) unlawfully operating, managing and controlling the Mallett Practices; (ii) establishing relationships with the laypersons associated with the Clinics; (iii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for the Fraudulent Services; (iv) arranged for and provided the funding associated with the Fraudulent Services; and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO")

Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

26.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of Pertinent Law Governing No-Fault Reimbursement

27.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

29.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

30.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an

"NF-3").   In the alternative, a health care provider may submit claims using the Health Care

Financing Administration insurance claim form (known as the "HCFA-1500 form").

31.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for

or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements

necessary to provide the underlying services.

32.     The implementing regulation adopted by the Superintendent of Insurance, 11

N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section
> 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New
> York State or local licensing requirement necessary to perform such service in New
> York ….   (Emphasis added).

33.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control

a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent

statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a

medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory

exceptions not applicable in this case, derive economic benefit from physician services.

35.     New York law prohibits licensed healthcare services providers, including physicians,

from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education

Law §§ 6509-a; 6530(18); and 6531.

36.     New York law prohibits unlicensed persons not authorized to practice a profession,

like medicine, from practicing the profession and from sharing in the fees for professional services.

See, e.g., New York Education Law § 6512, § 6530(11), and (19).

37.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive

No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange

for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

38.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

39.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

40.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

41.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

42.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

43.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   **Defendants' Fraudulent Scheme**

### A.    **Mallett and His Recruitment**

44.     Mallett is a physician who specializes in Urology.

45.     Mallett became licensed to practice medicine in New York in 1981.

46.     According to public records, Mallett currently is employed with Urology Associates of NY as a Urologist and primarily works out of a private medical office in Brooklyn, New York from the following location at 2101 Avenue X ("the Avenue X Location"):



47.     According to GEICO's claim records, it has never received any billing for the Fraudulent Services purportedly rendered to Insureds by the Mallett Defendants from the Avenue X Location.

48.     Instead, Mallett, through Mallett Medical, purported to render Fraudulent Services to Insureds from sixteen (16) separate Clinic locations located in Brooklyn, the Bronx, Queens, and Nassau County.

49.     In addition, Mallett, through 334 Grand Concourse Medical, purported to render Fraudulent Services to Insureds from twenty seven (27) separate Clinic locations located in Brooklyn, the Bronx, Queens, and Nassau County.

50.     In 2021, Mallett was recruited by the John Does Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers

millions of dollars for medically unnecessary, experimental, and otherwise non-reimbursable services. Based on the arrangement, Mallett would receive a periodic payment in exchange for allowing his name, license and the tax identification number of the Mallett Practices to be used and would contend that he supervised the Fraudulent Services if any insurance company ever inquired.

51.     At the time, Mallett was a perfect candidate for the scheme because he was in significant financial debt, including years of federal tax delinquencies that totaled more than $200,000.00.

52.     For example, Mallett had personal tax liens imposed upon him by the Internal Revenue Service as follows: (i) on February 7, 2018, in the amount of $73,536.00; (ii) on December 16, 2016, in the amount of $53,186.00; and (iii) on February 1, 2016, in the amount of $74,905.00.

53.     Shortly before the filing of this complaint, GEICO attempted to speak with Mallett in an effort to allow him to explain the issues over which GEICO had concerns.  Mallett admitted to GEICO during the course of that conversation that: (i) he was not aware of the billing for Fraudulent Services, and (ii) he did not bill GEICO for ESWT.

**B.     Gaining Access to Insureds**

54.     The Mallett Practices had no legitimate indicia.  They had no fixed treatment locations of any kind, did not maintain a stand-alone practice, were not the owners or leaseholders in any of the real property from which they purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise or market their services to the general public.

55.     In fact, the John Doe Defendants controlled the fraudulent scheme using the name of Mallett and the Mallett Practices on an itinerant basis from approximately thirty (30) Clinics,

primarily located in Brooklyn, the Bronx, and Queens, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangements.  For example, Mallett Medical billed for treating Insureds at the following Clinic locations:

| Clinic - Street Address | Clinic – Borough/County |
|---|---|
| 2016 Grand Avenue | Nassau |
| 2098 Rockaway Parkway | Brooklyn |
| 2184 Flatbush Avenue | Brooklyn |
| 222-01 Hempstead Avenue | Queens |
| 225-21 Linden Blvd. | Queens |
| 2365 Westchester Avenue | Bronx |
| 245 Rockaway Avenue | Nassau |
| 2488 Grand Concourse | Bronx |
| 2673 Atlantic Avenue | Brooklyn |
| 3041 Avenue U | Brooklyn |
| 3250 Westchester Avenue | Bronx |
| 4109 108th Street | Queens |
| 548 Howard Avenue | Brooklyn |
| 632 Utica Avenue | Brooklyn |
| 69-37 Myrtle Avenue | Queens |
| 97-14 Rockaway Blvd. | Queens |

56.     334 Grand Concourse Medical billed for treated Insureds at the following Clinic locations, which includes almost all of the Clinics that Mallett Medical purportedly performed Fraudulent Services:

| Clinic - Street Address | Clinic – Borough/County |
|---|---|
| 2016 Grand Avenue | Nassau |
| 2184 Flatbush Avenue | Brooklyn |
| 222-01 Hempstead Avenue | Queens |
| 225-21 Linden Blvd. | Queens |
| 2354 Westchester Avenue | Bronx |
| 245 Rockaway Avenue | Nassau |
| 2488 Grand Concourse | Bronx |
| 2673 Atlantic Avenue | Brooklyn |
| 2098 Rockaway Parkway | Brooklyn |
| 3041 Avenue U | Brooklyn |
| 3250 Westchester Avenue | Bronx |
| 360A West Merrick Road | Nassau |

| | |
|---|---|
| 4104 Farragut Road | Brooklyn |
| 4109 108th Street | Queens |
| 632 Utica Avenue | Brooklyn |
| 89-25 130th Street | Queens |
| 9016 Sutphin Blvd. | Queens |
| 92-08 Jamaica Avenue | Queens |
| 69-37 Myrtle Avenue | Queens |
| 9701 101st Avenue | Queens |
| 548 Howard Avenue | Brooklyn |
| 102-28 Jamaica Avenue | Queens |
| 127 Post Avenue | Nassau |
| 1735 Pitkin Avenue | Brooklyn |
| 97-14 Rockaway Blvd. | Queens |

57.     To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

58.     The Clinics provided facilities for Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

59.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

60.   For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 3250 Westchester Avenue, Bronx, New York from a revolving door of more than one hundred forty (140) purportedly different healthcare providers.

61.   As additional examples, GEICO also received billing for purported healthcare services from the Defendants at the following locations, each of which contained an ever-changing number of fraudulent healthcare providers:

> (i)    The Clinic located at 1735 Pitkin Avenue, Brooklyn, was a revolving door of more than 90 purportedly different healthcare providers;
>
> (ii)   The Clinic located at 92-08 Jamaica Avenue, Queens, was a revolving door of more than 70 purportedly different healthcare providers; and
>
> (iii)  The Clinic located at 97-01 101st Avenue, Queens, was a revolving door of more than 65 purportedly different healthcare providers.

62.   At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

63.   In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". The payments were, in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

64.   As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, had them undergo phony testing, and submit to purported therapy services that were experimental and

investigational, among other things, all solely to maximize profits without regard to genuine patient care.

66.     In keeping with the fact that the Clinics controlled the patient base and that the Mallett Practices was simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances between June 2021 and December 2021 where the Mallett Practices were: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds; and (ii) were one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in weekly sequences.

66.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

**C.     Defendants Place the Fraudulent Scheme Into Motion**

67.     Once all the necessary "pieces" were in place and Mallett had turned control of the Mallett Practices over to the John Doe Defendants, the fraud scheme was put into overdrive.  John Doe Defendants began to illegally operate and manage the Mallett Practices and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers over a million dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

68.     During the six (6) month period, the Defendants submitted more than 875 bills to GEICO involving approximately 500 separate patients and sought more than $1.75 million for the

Fraudulent Services. As a direct result of the Defendants scheme, the Defendants obtained more than $1,000,000.00 from GEICO.

69.     In an effort conceal the total amount of billed and avoid detection by GEICO and other New York automobile insurers, the Defendants used both Mallett Practices interchangeably and to split the bills to make it appear that two separate entities were performing services on Insureds, when in reality the Mallett Practices operated under a single scheme. In keeping with the fact that the Defendants used the Mallett Practices to hide their fraudulent scheme from GEICO, more than $200,000.00 worth of bills submitted using the tax identification number of Mallett Medical contained the name of 334 Grand Concourse Medical on the bills to GEICO.

70.     In furtherance of the scheme, the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Funders with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them rather than Mallett.

71.     As a result of those efforts, the John Doe Defendants received hundreds of thousands, if not millions, of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatory to the agreements. In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

72.     Through the funding and collection arrangement, the John Doe Defendants controlled the Mallett Practices and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services. The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well

as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

73.     An overwhelming majority of these claims were accompanied by a letter from the collection lawyers, representing that they represented Mallett and the Mallett Practices in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

**D.      The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

74.     The Fraudulent Services billed in the name of the Mallett Practices were not medically necessary and were provided -- to the extent they were provided at all -- pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

75.     Neither Mallett nor any other licensed physicians were ever involved in the performance of the Fraudulent Services. In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

76.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services, and the only point in having the Insureds seen by the unlicensed technicians

was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

77.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

78.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

79.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

### 1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

80.     The Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments". In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Mallett Practices was just one of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic "form", which, at most, only typed the name of the 334 Grand Concourse Medical at the top of the form. The following is a representative example:

81.     Of consequence, the claims submitted to GEICO by the Defendants with an NF-3 form that falsely represented that Mallett performed ESWT "treatments" included "reports" that virtually always contained a duplicated signature for Mallett, which appears to be a digitized copy of Mallett's signature. Neither the "notes" associated with the ESWT "treatments" nor the claims that were submitted to GEICO by the Defendants ever identified who actually performed the service on the Insured.

82.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.  According to the billing, the Fraudulent Services were provided at multiple locations in the same day, with multiple instances of four or more separate treatment locations on some days.

83.     For example:

(i)     The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 7, 2021, to 38 different Insureds at six different Clinics in four different counties in the New York Metropolitan area;

(ii)    The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 20, 2021, to 35 different Insureds at five different Clinics in three different counties in the New York Metropolitan area;

(iii)   The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 14, 2021, to 31 different Insureds at seven different Clinics in three different counties in the New York Metropolitan area;

(iv)    The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 28, 2021, to 27 different Insureds at four different Clinics in three different counties in the New York Metropolitan area;

(v)     The Defendants billed GEICO for purportedly providing ESWT "treatment" on August 31, 2021, to 25 different Insureds at four different Clinics in three different counties in the New York Metropolitan area;

(vi)    The Defendants billed GEICO for purportedly providing ESWT "treatment" on August 3, 2021, to 24 different Insureds at five different Clinics in three different counties in the New York Metropolitan area;

(vii)   The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 8, 2021, to 23 different Insureds at five different Clinics in three different counties in the New York Metropolitan area;

(viii)  The Defendants billed GEICO for purportedly providing ESWT "treatment" on August 25, 2021, to 23 different Insureds at five different Clinics in three different counties in the New York Metropolitan area; and

(ix)    The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 22, 2021, to 22 different Insureds at four different Clinics in three different counties in the New York Metropolitan area;

(x)     The Defendants billed GEICO for purportedly providing ESWT "treatment" on July 9, 2021, to 21 different Insureds at four different Clinics in three different counties in the New York Metropolitan area.

84.     Additionally, and in further support of the fact that the billing submitted by the Defendants falsely represented that Mallett performed the actual service, in April 2022 GEICO spoke with Mallett who at the time stated he was unaware of and did not bill GEICO for performing ESWT.

85.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identification numbers associated with the Mallett Practices using CPT code 0101T.

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

**CATEGORY III CODES**
**Medical Fee Schedule**

**0042T–0504T**
**Effective April 1, 2019**

86.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

87.     Furthermore, the ESWT treatment allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.  In the first instance, the charges were fraudulent in that the

unlicensed technicians controlled by the John Doe Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the John Doe Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

88.     Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

89.     Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report containing a copy of Mallett's signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

90.    For example, the Defendants regularly rendered ESWT to Insureds less than twenty

(20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named JP on July 15, 2021, only 12 days after the Insured's accident on July 3, 2021.

(ii)    Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named AR on July 20, 2021, only nine days after the Insured's accident on July 11, 2021.

(iii)   Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named MA on July 22, 2021, only nine days after the Insured's accident on July 13, 2021.

(iv)    Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named OT on July 28, 2021, only 11 days after the Insured's accident on July 17, 2021.

(v)     Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named AG on July 28, 2021, only ten days after the Insured's accident on July 18, 2021.

(vi)    Defendants purported to provide ESWT through Mallett Medical to an Insured named RS on August 5, 2021, only 13 days after the Insured's accident on July 23, 2021.

(vii)   Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named TH on August 12, 2021, only 15 days after the Insured's accident on July 28, 2021.

(viii)  Defendants purported to provide ESWT through 334 Grand Concourse Medical to an Insured named MF on August 12, 2021, only 11 days after the Insured's accident on August 1, 2021.

(ix)    Defendants purported to provide ESWT through Mallett Medical to an Insured named OR on August 12, 2021, only seven days after the Insured's accident on August 5, 2021.

(x)     Defendants purported to provide ESWT through Mallett Medical to an Insured named RB on August 19, 2021, only ten days after the Insured's accident on August 9, 2021.

(xi)     Defendants purported to provide ESWT through Mallett Medical to an Insured named AH on August 20, 2021, only five days after the Insured's accident on August 15, 2021.

(xii)    Defendants purported to provide ESWT through Mallett Medical to an Insured named AH on August 27, 2021, only 12 days after the Insured's accident on August 15, 2021

(xiii)   Defendants purported to provide ESWT through Mallett Medical to an Insured named AA on September 16, 2021, only four days after the Insured's accident on September 12, 2021.

(xiv)    Defendants purported to provide ESWT through Mallett Medical to an Insured named LD on September 16, 2021, only four days after the Insured's accident on September 12, 2021.

(xv)     Defendants purported to provide ESWT through Mallett Medical to an Insured named JC on September 16, 2021, 2021, only one day after the Insured's accident on September 15, 2021.

91.     These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

(i)      On April 5, 2021, two Insureds – JR and LSR – were involved in the same automobile accident. Thereafter, JR and LSR both presented to the same Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Ave. Clinic"), and each purportedly received ESWT "treatments" from Mallett Medical.

(ii)     On May 2, 2021, two Insureds – AJ and LM – were involved in the same automobile accident. Thereafter, AJ and LM both presented to the same Clinic located at 3041 Avenue U, Brooklyn, New York, and each purportedly received ESWT "treatments" from Mallett Medical.

(iii)    On May 3, 2021, two Insureds – MB and SB– were involved in the same automobile accident. Thereafter, MB and SB both presented to the same Clinic located at 4109 108th Street, Corona, New York, and each purportedly received ESWT "treatments" from Mallett Medical.

(iv)     On May 11, 2021, two Insureds – GM and ZM – were involved in the same automobile accident. Thereafter, GM and ZM both presented to the same Clinic located at the Westchester Ave. Clinic, and each purportedly received ESWT "treatments" from Mallett Medical on multiple occasions.

(v)     On May 14, 2021, two Insureds – FW and TW – were involved in the same automobile accident. Thereafter, FW and TW both presented to the same Clinic located at 2184 Flatbush Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" from Mallett Medical.

(vi)    On May 31, 2021, two Insureds – MP and MR – were involved in the same automobile accident. Thereafter, MP and MR both presented to the same Clinic located at 2098 Rockaway Parkway, Brooklyn, New York, and each purportedly received ESWT "treatments" from 334 Grand Concourse Medical.

(vii)   On June 9, 2021, two Insureds – FM and EG – were involved in the same automobile accident. Thereafter, FM and EG both presented to the same Clinic located at 2488 Grand Concourse, Bronx, New York, and each purportedly received ESWT "treatments" from the 334 Grand Concourse Medical on multiple occasions.

(viii)  On June 27, 2021, two Insureds – CA and TW – were involved in the same automobile accident. Thereafter, CA and TW both presented to the same Clinic located at the Westchester Ave. Clinic, and each purportedly received ESWT "treatments" from 334 Grand Concourse Medical on multiple occasions.

(ix)    On July 17, 2021, two Insureds – TJ and OT – were involved in the same automobile accident. Thereafter, TJ and OT both presented to the same Clinic located at 632 Utica Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" from 334 Grand Concourse Medical.

(x)     On July 24, 2021, two Insureds – MW and ND – were involved in the same automobile accident. Thereafter, MW and ND both presented to the same Clinic located at the Westchester Ave. Clinic, and each purportedly received ESWT "treatments" from 334 Grand Concourse Medical on multiple occasions.

92.     These are only representative samples. In all of the claims identified in Exhibit "1" for ESWT, the Defendants falsely represented that the ESWT "treatments" were medically necessary, when in fact they were not medically necessary for each Insured, were pursuant to predetermined fraudulent protocols, and were therefore not eligible to collect No-Fault Benefits in the first instance.

93.     In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

94.     Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.

95.     The following is a representative sample of the bills submitted from each of the Mallett Practices:

<u>Mallett Medical</u>

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/12/2021 | 3250 Westchester Ave, Bronx, NY, 10461 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700.39 |
| 08/12/2021 | 3250 Westchester Ave, Bronx, NY, 10461 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700.39 |
| 08/12/2021 | 3250 Westchester Ave, Bronx, NY, 10461 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE RIGHT SHOULDER | 1 | 0101T | $ 700.39 |

**TOTAL CHARGES TO DATE  $ 2101.17**

<u>344 Grand Concourse Medical</u>

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/31/2021 | 222-01 Hempstead Avenue, Queens Village, NY, 11429 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE THORACIC AREA | 1 | 0101T | $ 700.39 |
| 08/31/2021 | 222-01 Hempstead Avenue, Queens Village, NY, 11429 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700.39 |
| 08/31/2021 | 222-01 Hempstead Avenue, Queens Village, NY, 11429 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700.39 |

**TOTAL CHARGES TO DATE  $ 2101.17**

96.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) times for virtually every date of service.

97.     In all the claims identified in Exhibit "1" for ESWT testing, the Defendants falsely represented that the ESWT charges were medically necessary, were performed by Mallett, and were appropriately charged, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2.     The Fraudulent Charges for Electrodiagnostic Testing

98.     As set forth in Exhibit "1", the Defendants, through 334 Grand Concourse Medical, also purported to subject many Insureds to a series of medically unnecessary and useless EMG and NCV tests (collectively, "EDX" tests).

99.     The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant predetermined fraudulent protocols designed solely to financially enrich the Defendants and as a result of the illegal kickback and referral scheme described above, not to treat or otherwise benefit the Insureds.

100.     NCV tests and EMG tests are forms of electrodiagnostic tests on the human nervous system which were purportedly provided by the Defendants because such testing was medically necessary to determine whether the Insureds had radiculopathies.

101.     The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

102.     Two primary functions of the nervous system are to: (i) collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain; and (ii) transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

103.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

104.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

105.     The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

106.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology, and the American Academy of Physical Medicine and Rehabilitation.

### a.      The Fraudulent NCV Tests

107.    NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization or "firing" of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

108.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

109.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

110.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

111.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies are generally used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV tests are designed to evaluate nerve conduction in nerves within a limb.

112.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

113.    In an attempt to extract the maximum billing out of each Insured who purportedly received NCV tests, the Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

114.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, through 334 Grand Concourse Medical, the Defendants routinely purported to perform and/or provide NCV tests well beyond the amounts indicated in the Recommended Policy.

115.    For example:

(i)     On or July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named BT with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(ii)    On or July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named JA with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(iii)   On or July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named AC with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(iv)    On or July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named AO with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in

34

the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(v)     On or July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named ME with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(vi)     On or July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named DF with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $653.46 for these tests through 334 Grand Concourse Medical.

(vii)     On or August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named DR with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $1,596.20 for these tests through 334 Grand Concourse Medical.

(viii)     On or August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named ARS with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $1,596.20 for these tests through 334 Grand Concourse Medical.

(ix)     On or August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named PS with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $1,596.20 for these tests through 334 Grand Concourse Medical.

(x)     On or August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named KP with: (i) 8 motor nerve NCV tests; (ii) 10 sensory nerve NCV tests; and (iii) 10 H-reflex studies, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $1,596.20 for these tests through 334 Grand Concourse Medical.

116.    These are only representative samples. In virtually all of the claims identified in Exhibit "1" for NCV tests, the Defendants purportedly performed NCV tests on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds had radiculopathies or any other medical condition.

117.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

118.    In a legitimate clinical setting, this decision is determined based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

119.    Thus, the nature and number of the peripheral nerves as well as the type of nerve fibers tested with NCV tests should vary from one patient to the next.

120.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCV tests] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

121.    This concept also is emphasized in the CPT Assistant, which states that "[p]re-set protocols automatically testing a large number of nerves are not appropriate."

122.    Even so, the Defendants did not tailor the NCV tests they purportedly performed to the unique circumstances of each individual Insured.

123.    Instead, they applied a fraudulent treatment protocol and purportedly performed NCV tests on virtually the same nerves and nerve fibers in virtually all of the NCV tests identified in Exhibits"1".

124.    Though the NCV tests are allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, the NCV tests were provided to the Insureds – to the extent that they were provided at all – as part of the predetermined fraudulent protocol designed to maximize the billing that could be submitted for each Insured.

125.    In all of the charges identified in Exhibit "1" for NCV tests, the Defendants fraudulently misrepresented that the charges for NCV tests were medically necessary, when the NCV test were not medically necessary and issued as part of a predetermined fraudulent protocol designed to maximize the charges that Defendants could submit to GEICO and other insurers.

### b.    The Fraudulent EMG Tests

126.    As part of their predetermined fraudulent protocol, the Defendants also bill GEICO for providing medically unnecessary EMG tests through 334 Grand Concourse Medical to virtually every Insured who received NCV tests.

127.    EMG tests involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is then compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

128.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

129.    The Defendants purported to provide and/or perform EMG tests on Insureds to determine whether the Insureds suffered from radiculopathies. In actuality, the EMG tests were provided – to the extent they were provided at all – as part of the Defendants' predetermined fraudulent protocol designed to maximize the billing that they could submit for each Insured.

130.     There are many different muscles in the arms and legs that can be tested using EMG tests. A healthcare provider's decision as to the number of limbs and which muscles to test in each limb should be tailored to each Insured's unique circumstances.

131.     In a legitimate clinical setting, this decision is based upon a thorough history and physical examination of the individual patient, as well as the real-time results obtained from the EMG tests as they are performed on each specific muscle.

132.     As a result, the quantity of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient to patient.

133.     The Defendants did not tailor the EMG tests that they purported to perform to the unique circumstances of each patient. Instead, they virtually always purported to test the same muscles in the same limbs on each of the patients, without regard for the patients' individual presentation.

134.     Furthermore, even if there was any need for the EMG tests, the nature and number of the EMG tests that the Defendants purported to provide and/or perform often grossly exceeded the maximum number of limbs tested (i.e., two limbs) that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

135.     Nevertheless, the Defendants virtually always purported to perform EMG tests on all four limbs on the Insureds in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO, solely to maximize the profits that Defendants could reap from each Insured.

136.     For example:

   (i)     On or about July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named BT with EMG tests on all four of BT's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants

then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(ii)     On or about July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named JA with EMG tests on all four of JA's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(iii)    On or about July 7, 2021, 334 Grand Concourse Medical purported to provide an Insured named AC with EMG tests on all four of AC's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(iv)     On or about July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named ME with EMG tests on all four of ME's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(v)      On or about July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named AO with EMG tests on all four of AO's limbs, despite documentation in a medical report that stated AO refused EMG testing of AO's upper and lower extremities. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(vi)     On or about July 8, 2021, 334 Grand Concourse Medical purported to provide an Insured named DF with EMG tests on all four of DF's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(vii)    On or about August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named DR with EMG tests on all four of DR's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(viii)    On or about August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named ARS with EMG tests on all four of ARS's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(ix)    On or about August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named PS with EMG tests on all four of PS's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

(x)    On or about August 11, 2021, 334 Grand Concourse Medical purported to provide an Insured named KP with EMG tests on all four of KP's limbs, without any documentation necessitating the need for conducting tests beyond the amounts indicated in the Recommended Policy. The Defendants then billed GEICO $809.00 for the four-limb EMG test through 334 Grand Concourse Medical.

137.    These are only representative samples. In virtually all the claims identified in Exhibit "1" for EMG tests, the Defendants purportedly performed EMG tests on all four limbs using virtually the same muscles in the same limbs on each of the patients, in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the EMG tests were medically necessary.

138.    In keeping with the fact that the EMG tests were medically useless and issued pursuant to a predetermined fraudulent protocol, the Defendants virtually always performed or purported to perform the NCV tests and EMG tests immediately following the initial examination.

139.    A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Defendants to spend at least two hours with each patient.

140.    The fact that each of the patients purportedly subjected to the fraudulent NCV tests and EMG tests set aside two hours to receive a neurological examination and NCV tests and EMG

tests indicates that either: (i) the patients knew in advance of the visit that they were to receive the NCV tests and EMG tests because the NCV tests and EMG tests are rendered pursuant to a predetermined treatment protocol; or (ii) the Fraudulent Services were not actually performed as billed.

141.    In all of the charges identified in Exhibit "1" for EMG tests, the Defendants fraudulently misrepresented that the charges for EMG tests were medically necessary, when the EMG tests were not medically necessary and issued as part of a predetermined fraudulent protocol designed to maximize the charges that Defendants could submit to GEICO and other insurers.

**E.    The Fraudulent Billing for Independent Contractor Services**

142.    The fraudulent scheme also included the submission of claims to GEICO using the Mallett Practices seeking payment for services provided by individuals that the Mallett Practices never employed.

143.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.   The healthcare services must be provided by the billing provider itself, or by its employees.

144.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-

21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

145.    From June 2021 through December 2021, approximately 800 separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services that were performed by individuals other than Mallett, while falsely representing in that Mallett was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who actually performed the services and their relationship to the billing providers that were being operated and controlled by the John Doe Defendants in violation of New York law.

146.    In fact, virtually every NF-3 form associated with the approximately 800 bills that submitted to GEICO appeared as follows:

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 3**

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Errol C Mallett | MD | Lic # 146738 | No | | |
| | | | | | |
| | | | | | |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Errol C Mallett   146738   OWNER

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES ☐ | NO ☐ |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT

Not Determined at this time

147.    The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never: (i) employed by Mallett or either of the Mallett Practices; and (ii) under Mallett's direction and/or control.

148.    In fact, the unlicensed technicians were performing services for multiple other "providers" being operated and controlled by the John Doe Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

149.    In keeping with the fact all of the bills to GEICO identifying Mallett as the person who purportedly performed the service when unlicensed technicians performed the Fraudulent Services under the operation and control by the John Doe Defendants, virtually all of the Insureds identified in Exhibit "1" received ESWT from various providers, including the Mallett Defendants, at a single Clinic.

150.    For example:

(i)     An Insured named KJ was purportedly involved in a motor vehicle accident on June 5, 2021 and began treating at the clinic located at 2184 Flatbush Avenue, Brooklyn, New York (the "Flatbush Ave. Clinic").  While treating at the Flatbush Ave Clinic, KJ purportedly received ESWT from the following healthcare providers: (i) Community Medical Care of NY, P.C ("Community Medical").; (ii) Mallett Medical; and (iii) 334 Grand Concourse Medical.

(ii)    An Insured named TJ was purportedly involved in a motor vehicle accident on July 17, 2021 and began treating at the clinic located at at 632 Utica Avenue, Brooklyn, New York (the "Utica Ave. Clinic"). While treating at the Utica Ave. Clinic, TJ purportedly received ESWT from the following healthcare providers: (i) Sooraj Poonawala, M.D. ("Poonawala M.D.); (ii) Ahmed Riaz, M.D. ("Riaz M.D."); (iii) 334 Grand Concourse Medical; (iv) Miklos Losonczy, M.D. ("Losonczy M.D."); and (v) Five Crest Diagnostic Medical, P.C. ("Five Crest Diagnostic").

(iii)   An Insured named DB was purportedly involved in a motor vehicle accident on August 8, 2021, and began treating at the Westchester Ave. Clinic. While treating at the Westchester Ave. Clinic, DB purportedly received ESWT on from the following healthcare providers: (i) 334 Grand Concourse Medical; and (ii) Headlam Medial, P.C. ("Headlam Medical").

(iv)     An Insured named GK was purportedly involved in a motor vehicle accident on August 3, 2021 and began treating at the clinic located at 97-14 Rockaway Blvd., Ozone Park, New York (the "Rockaway Blvd. Clinic"). While treating at the Rockaway Blvd. Clinic, GK purportedly received ESWT on from the following healthcare providers: (i) KBJ Medical Practice, P.C.; (ii) Maxime Coles Services; (iii) Rajesh Vindhya, M.D.; and (iv) 334 Grand Concourse Medical.

(v)      An Insured named LSR was purportedly involved in a motor vehicle accident on April 5, 2021 and began treating at the Westchester Ave. Clinic. While treating at the Westchester Ave. Clinic, LSR purportedly received ESWT on from the following healthcare providers: (i) Metropolitan Medical and Surgical, P.C ("Metropolitan Medical").; (ii) Losonczy M.D.; (iii) Mallett Medical; and (iv) 334 Grand Concourse Medical.

(vi)     An Insured named JJF was purportedly involved in a motor vehicle accident on May 2, 2021 and began treating at the clinic located at 225-21 Linden Blvd. Cambria Heights, New York (the "Linden Blvd. Clinic"). While treating at the Linden Blvd Clinic, JJF purportedly received ESWT on from the following healthcare providers: (i) Community Medical; (ii) Garden Medical Care, P.C. ("Garden Medical"); (iii) Mark H. Vine, M.D.; and (iv) Mallett Medical.

(vii)    An Insured named CR was purportedly involved in a motor vehicle accident on December 24, 2020, and began treating at the Westchester Ave. Clinic.  While treating at the Westchester Ave. Clinic, CR purportedly received ESWT on from the following healthcare providers: (i) Metropolitan Medical; (ii) Chand Medical, P.C.; (iii) Community Medical; and (iv) Mallett Medical.

(viii)   An Insured named MB was purportedly involved in a motor vehicle accident on February 6, 2021 and began treating at the Utica Ave. Clinic. While treating at the Utica Ave. Clinic, MB purportedly received ESWT on from the following healthcare providers: (i) Five Crest Diagnostic; (ii) Poonawala M.D.; (iii) Riaz, M.D.; and (iv) Mallett Medical.

(ix)     An Insured named TD was purportedly involved in a motor vehicle accident on May 1, 2021 and began treating at the Utica Ave. Clinic. While treating at the Utica Ave. Clinic, TD purportedly received ESWT on from the following healthcare providers: (i) Five Crest Diagnostic; (ii) Poonawala M.D.; (iii) Riaz, M.D.; (iv) Losonczy M.D.; and (v) Mallett Medical.

(x)      An Insured named MW was purportedly involved in a motor vehicle accident on June 6, 2021 and began treating at a Clinic located a 3041 Avenue U, Brooklyn, New York (the "Ave. U Clinic"). While treating at the Ave. U Clinic, MW purportedly received ESWT on from the following healthcare providers:

(i) Garden Medical; (ii) Mallett Medical; and (iii) 334 Grand Concourse Medical.

151.    These are only representative samples. Virtually all the Insureds identified in Exhibit "1" treated at Clinics that employed unlicensed technicians to perform the Fraudulent Services on Insureds, which were subsequently billed to GEICO and other New York automobile insurers by the Defendants as being performed by Mallett when he did not perform or directly supervise the Fraudulent Services.

152.    In addition to the fraudulent ESWT charges that misrepresented they were performed by Mallett, the Defendants also routinely submitted fraudulent charges to GEICO and other insurers, through 334 Grand Concourse Medical, seeking payment for EDX testing alleged to have been performed by technicians and/or physicians employed by 334 Grand Concourse Medical.  However, neither the technicians nor the physician identified as having performed the services ever an actual employee of Mallett or 334 Grand Concourse.  Rather, they were at all relevant times independent contractors, as (i) they set their own work schedules, (ii) provided similar services for competing medical practices at the same time; (iii) worked without supervision by Mallett; (iv) were not provided with employee benefits, (iv) were paid, either in whole or in part, on a 1099 basis rather than a W-2 basis; and (vi) paid for their own malpractice insurance.

153.    By way of example:

- Defendants submitted multiple bills to GEICO that identified Hadassah Orenstein, M.D. ("Orenstein") as an employee of 334 Grand Concourse Medical and the provider of the fraudulent EDX Testing.

- At the same time that Orenstein was purportedly employed by 334 Grand Concourse Medical, he provided identical healthcare services to different Insureds on behalf of different healthcare practices at the same Clinics and at different Clinics.

- During the same time that Orenstein was performing initial examinations, EMG testing, and NCV testing on GEICO Insureds at the Westchester Avenue Clinic (August 2021 to December 2021), he also purported to

provide the exact same services to different Insureds at the same location as a purported employee of: (i) Headlam Medical; and (ii) Losonczy, M.D.

- During the same time period, Orenstein also purported to provide the exact same services to different Insureds at various Clinics throughout the New York Metropolitan area as a purported employee of: (i) Headlam Medical; (ii) Losonczy, M.D.; (iii) Forest Hills Healthcare Physician, P.C. ("Forest Hills Physician"); and (iv) Rafael Antonio Delacruz-Gomez, M.D. ("Delacruz-Gomez MD").

154.    Similarly, Defendants submitted multiple bills to GEICO that identified Opeoluwa Eleyinafe, M.D. ("Eleyinafe") as an employee of 334 Grand Concourse Medical who purported to provide the Fraudulent Services to Insureds. However, while Eleyinafe was purportedly employed by 334 Grand Concourse Medical, Eleyinafe also provided virtually identical healthcare services to different Insureds on behalf of different healthcare practices at different Clinics.

155.    These are only representative examples. In all the bills submitted to GEICO for Fraudulent Services that represented the services were performed by an employee, the Fraudulent Services – to the extent that they were actually performed – were actually performed either by: (i) an unlicensed technician at the direction of the John Doe Defendants; or (ii) a physician who was never employed by Mallet or the Mallett Practices.

156.    Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Mallett and/or the Mallett Practices, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint.

157.    The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

### III.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

158.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, AOBs and medical reports/records using the name of the Mallett Practices and its tax identification number seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

159.     The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Mallett had performed the Fraudulent Services and that his name, license and the tax identification numbers of the Mallett Practices were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed each medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

(v)     The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by individuals not employed by Mallett or the Mallett Practices.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

160.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

161.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

162.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Mallett in the performance of the Fraudulent Services and Mallett's lack of control and/or management of the Mallett Practices. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

163.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services. In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals employed by Mallett and/or the Mallett Practices.

164.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly

and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,000,000.00 based upon the fraudulent charges.

165.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
**Against Mallett Medical and 334 Grand Concourse Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

167.    There is an actual case and controversy between GEICO on the one hand and Mallett Medical and 334 Grand Concourse Medical on the other hand regarding more than $600,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

168.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

169.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary

and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

170.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

171.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

172.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

173.    Mallett Medical and 334 Grand Concourse Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or either of the Mallett Practices.

174.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Mallett and the Mallett Practices have no right to receive payment for any pending bills submitted to GEICO.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Mallett and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

175.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

176.     Mallett Medical and 334 Grand Concourse Medical together constitute an association-in-fact "enterprise" (the "Mallett Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

177.     The members of the Mallett Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Mallett Medical and 334 Grand Concourse Medical are independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

178.     The Mallett Fraud Enterprise operated under two separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Mallett Fraud Enterprise acting singly or without the aid of each other.

179.    The Mallett Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

180.    Mallett and the John Doe Defendants each has been employed by and/or associated with the Mallett Fraud Enterprise.

181.    Mallett and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Mallett Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Mallett Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of

illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or either of the Mallett Practices. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

182.    The Mallett Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Mallett and the John Doe Defendants operate the Mallett Fraud Enterprise, inasmuch as the Mallett Fraud Enterprise never operated legitimate medical practices, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Mallett Medical and 334 Grand Concourse Medical to the present day.

183.    The Mallett Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York

automobile insurers. These inherently unlawful acts are taken by the Mallett Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by the Mallett and the John Doe Defendants through the Mallett Fraud Enterprise.

184.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Mallett and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

185.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

186.   The Mallett Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

187.   Mallett and the John Doe Defendants are employed by and/or associated with the Mallett Fraud Enterprise.

188.   Mallett and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Mallett Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Mallett Medical and 334 Grand Concourse Medical were not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe

54

Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or either of the Mallett Practices.   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

189.    Mallett and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

190.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by Defendants through the Mallett Sole Proprietorship and Mallett PC.

191.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Mallett and John Doe Defendants
(Violation of RICO, 18 U.S.C. § 1962(c))**

192.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

193.    Mallett Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

194.    Mallett and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Mallett Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Mallett Medical was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated

56

the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Mallett or any other licensed physician, but by persons who were unlicensed, not directly supervised by Mallett or employed by Mallett Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

195. Mallett Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated Mallett Medical, inasmuch as Mallett Medical never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Mallett Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Mallett Medical to the present day.

196. Mallett Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by Mallett Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted by the Defendants through Mallett Medical.

197. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Mallett and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

198.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

199.    Mallett Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

200.    Mallett and John Doe Defendants are employed by and/or associated with Mallett Medical. Mallett and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Mallett Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Mallett Medical was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services

that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Mallett or any other licensed physician, but by persons who were unlicensed, not directly supervised by Mallett or employed by Mallett Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

201.     Mallett and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

202.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted by Defendants through Mallett Medical.

203.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against Mallett, Mallett Medical, and John Doe Defendants**
**(Common Law Fraud)**

204.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

205.     Mallett and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services through Mallett Medical.

206.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Mallett had performed the Fraudulent Services and

that his name, license and the tax identification number of Mallett Medical was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Mallett never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed Mallett Medical; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Mallett, when in fact the services were provided by unlicensed individuals that were never supervised by Mallett or employed by Mallett Medical.

207.    Mallett and John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mallett Medical that were not compensable under New York no-fault insurance laws.

208.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $223,000.00 pursuant to the fraudulent bills submitted through Mallett Medical by Mallett and John Doe Defendants.

209.     Mallett and John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

210.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Mallett, Mallett Medical, and John Doe Defendants
### (Unjust Enrichment)

211.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

212.     As set forth above, Mallett and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

213.     When GEICO paid the bills and charges submitted by or on behalf of Mallett Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Mallett and John Doe Defendants improper, unlawful, and/or unjust acts.

214.     Mallett and John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Mallett and John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

215.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

216.     By reason of the above, Mallett and John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $223,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Mallett and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

217.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

218.    334 Grand Concourse Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Mallett and John Doe Defendants "1" through "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of 334 Grand Concourse Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted over a thousand fraudulent charges seeking payments that 334 Grand Concourse Medical was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not

provided by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or 334 Grand Concourse Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

219.    334 Grand Concourse Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated 334 Grand Concourse Medical, inasmuch as 334 Grand Concourse Medical never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for 334 Grand Concourse Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Mallett Medical to the present day.

220.    334 Grand Concourse Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by 334 Grand Concourse Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $778,000.00 pursuant to the fraudulent bills submitted by the Defendants through 334 Grand Concourse Medical.

221.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
**Against Mallett and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

222.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

223.    334 Grand Concourse Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

224.    Mallett and John Doe Defendants are employed by and/or associated with 334 Grand Concourse Medical. Mallett and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of 334 Grand Concourse Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that 334 Grand Concourse Medical was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather

than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or 334 Grand Concourse Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

225.    Mallett and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

226.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $778,000.00 pursuant to the fraudulent bills submitted by Defendants through 334 Grand Concourse Medical.

227.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TENTH CAUSE OF ACTION**
**Against Mallett, 334 Grand Concourse Medical, and John Doe Defendants**
**(Common Law Fraud)**

228.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

229.    Mallett and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services through 334 Grand Concourse Medical.

230.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Mallett had performed the Fraudulent Services and that his name, license and the tax identification number of 334 Grand Concourse Medical was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Mallett never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed 334 Grand Concourse Medical; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Mallett or another physician employed by 334 Grand Concourse Medical and were instead performed - to the extent that they were provided at all - by individuals, including unlicensed individuals, who were neither supervised by nor employed by Mallett or 334 Grand Concourse Medical.

231.    Mallett and John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay

charges submitted through 334 Grand Concourse Medical that were not compensable under New York no-fault insurance laws.

232.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $778,000.00 pursuant to the fraudulent bills submitted through 334 Grand Concourse Medical by Mallett and John Doe Defendants.

233.    Mallett and John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

234.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
**Against Mallett, 334 Grand Concourse Medical, and John Doe Defendants**
**(Unjust Enrichment)**

235.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 163 of this Complaint as if fully set forth at length herein.

236.    As set forth above, Mallett and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

237.    When GEICO paid the bills and charges submitted by or on behalf of 334 Grand Concourse Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Mallett and John Doe Defendants improper, unlawful, and/or unjust acts.

238.     Mallett and John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Mallett and John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

239.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

240.     By reason of the above, Mallett and John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $778,000.00.

**JURY DEMAND**

241.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action against Mallett Medical and 334 Grand Concourse Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Mallett and Mallett Practices have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.     On the Second Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $223,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $223,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Mallett, Mallett Medical, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $223,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

G.      On the Seventh Cause of Action against Mallett, Mallett Medical, and John Doe Defendants, more than $223,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $778,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Mallett and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$778,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      J.      On the Tenth Cause of Action against Mallett, 334 Grand Concourse Medical, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $778,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

      K.      On the Eleventh Cause of Action against Mallett, 334 Grand Concourse Medical, and John Doe Defendants, more than $778,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: June 21, 2022

                    RIVKIN RADLER LLP

                    By:    /s/ *Barry I. Levy*
                        Barry I. Levy, Esq.
                        Michael Vanunu, Esq.
                        Philip P. Nash, Esq.
                  926 RXR Plaza
                  Uniondale, New York 11556
                  (516) 357-3000

                  *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*